**PUBLIC REDACTED VERSION**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | | |
|---|---|---|
| **METLANG LLC,** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| **v.** | ) | No. _____ |
| | ) | |
| **THE UNITED STATES,** | ) | ▇▇▇▇▇▇▇▇ |
| | ) | |
| *Defendant.* | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Pursuant to 28 U.S.C. § 1491(b), Plaintiff Metlang LLC ("Metlang"), by its undersigned counsel, submits this bid protest Complaint.

## INTRODUCTION

1. This protest challenges a decision by the United States Department of Justice, Drug Enforcement Administration, Office of Acquisition ("DEA" or the "Agency") not to award to Metlang the labor hour Blanket Purchase Agreement ("BPA") resulting from the Agency's Request for Quote 15DDHQ26Q00000021 ("RFQ" or the "Solicitation") for the provision of the unified-role of Analytic Linguist services, whereby individual Analytic Linguists will provide analysis, monitoring, transcription, translation, interpretation, validation, and minimization of defined foreign languages. The DEA issued the RFQ through eBuy to General Services Administration ("GSA") Multiple Award Schedule ("MAS") contract holders assigned North American Industrial Classification System ("NAICS") code number 541930, translation and interpretation services.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

2.    Metlang seeks a determination on the merits that the Agency's evaluation of the awardee SOS International Inc.'s ("SOSi") quote, and resulting decision to select SOSi for award, was arbitrary and capricious because (i) the Agency violated the Procurement Integrity Act, 41 U.S.C. § 2101 *et seq.* ("PIA"), ████████████████████████ ████████████████████████████ (ii) SOSi's GSA MAS contract does not offer any one labor category that provides all of the services and credentials required by RFQ for the unified-role of Analytic Linguists including, but not limited to, minimization required under Title III;[1] (iii) SOSi was not a qualified Contractor as it did not have the requisite past performance for Analytic Linguistics services to be considered best value under the Solicitation; (iv) SOSi did not have the requisite corporate experience for Analytic Linguistics services to be considered best value under the Solicitation; and (v) the Agency failed to conduct a price realism analysis as it stated it would in responses in its Q&A with offerors.

3.    Metlang further seeks a determination that the Agency conducted a flawed best value determination inconsistent with the terms of the Solicitation which resulted in the Agency's failure to select Metlang for award.

4.    Metlang seeks a permanent injunction enjoining the Agency from proceeding with the BPA as awarded, ████████████████████████ ████████████████████████████████████

---

[1] "Title III" refers to that title of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522, (the "Safe Streets Act") which permits federal law enforcement to submit applications for judicial approval of interception of wire or oral communications by the Federal Bureau of Investigation ("FBI") or other federal law enforcement agencies with responsibility for investigating certain offenses enumerated in the statute.



██████ and make a new award decision consistent with the Solicitation ██████

██████. ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████.

## PARTIES

5.      Metlang is a Florida corporation whose principal address is 1815 Griffin Road, Suite 401, Dania Beach, Florida, 33004-2252.  Metlang is currently the incumbent contractor for Analytic Linguist services being provided to the DEA, and has been providing those services to the DEA for over twenty (20) years.

6.      Defendant is the United States of America acting through the DEA, a federal agency.

## JURISDICTION & STANDING

7.      The United States Court of Federal Claims has jurisdiction over this bid protest under the Tucker Act, 28 U.S.C. § 1491(b)(1), which allows the Court to hear "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

8.      Metlang, as an actual offeror under the RFQ, is an "interested party."  *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004) (holding that an "interested party" is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract").  The Agency arbitrarily

████████████████████████████████████████

████████████████████████████████████████

███████

and capriciously violated the PIA, arbitrarily and capriciously evaluated SOSi's quote inconsistent with the terms of the RFQ and, based on these improprieties, decided to make award to SOSi and not to Metlang. Metlang's economic interests were thus directly affected by the arbitrary and capricious decision by the Agency.

9.    Metlang here objects to:

  a.  The Agency's violation of the PIA ███████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████

  b.  The Agency's failure to determine whether the labor category proposed by SOSi under its GSA MAS contract met the unified Analytic Linguist requirements contained in the RFQ.

  c.  The Agency's flawed analysis of SOSi's insufficient past performance.

  d.  The Agency's flawed analysis of SOSi's insufficient corporate experience.

  e.  The Agency's failure to conduct a required price realism analysis.

  f.  The Agency's flawed best value tradeoff decision which selected SOSi's quote over Metlang's quote despite both the insufficiencies in SOSi's quote and its noncompliance with SOSi's MAS contract and without making sufficient efforts to determine whether SOSi's price was realistic and without making

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████

sufficient efforts to investigate and cure the harm caused to Metlang by the Agency's PIA violation.

10. The Court has jurisdiction to grant the relief requested under the Tucker Act, as amended, 28 U.S.C. § 1491(b)(2), and Rule 65 of the Rules of the United States Court of Federal Claims ("RCFC").

## BACKGROUND

### A. The Solicitation: RFQ 15DDHQ26Q00000021

11. The Agency's ultimate publication of the Solicitation came after a series of false starts. The Agency originally published a solicitation for a Nationwide Linguist BPA on March 3, 2025, as RFQ 15DDHQ25Q00000031, but after initial award was made to SOSi, which another competitor, Piedmont, protested to the U.S. Government Accountability Office ("GAO"), the Agency cancelled the award to SOSi and amended RFQ 15DDHQ25Q00000031 eleven times, before finally canceling the procurement on January 20, 2026.

12. The Agency published the Solicitation at issue here on January 21, 2026 to establish a Nationwide Linguist BPA. The Solicitation, as issued, again advised potential offerors that it was an RFQ that would result in the award of a National Linguist BPA against an offeror's GSA MAS contract assigned NAICS code number 541930, translation and interpretation services.

13. The RFQ's pricing structure contemplated a single, all-inclusive "Analytic Linguist" straight time and overtime rate for each identified category of language spoken (Spanish, English, Common and Exotic) in each DEA field division. This rate had to encompass all language-related services. (*See* Ex. A-1 at 4 ("Except for travel expenses, the cost for all direct

and indirect language-related services and other services, such as administrative costs, shall be included in the hourly Analytic Linguist rate specified in Section B of the contract"); *See also* Ex. A-7.)[2]

14.     The RFQ was amended six times, including on February 6, 2026.  The conformed copy of the RFQ published on February 6, 2026 is attached to this Complaint as Exhibit A-1.

15.     The Solicitation required proposals to be submitted by February 13, 2026.  (*See id.* at 2.)

16.     The Solicitation contemplated award of one labor-hour BPA for Analytic Linguist services in support of the DEA Title III Wiretap program.  (*See generally id.*)

17.     The Solicitation sought Analytic Linguists to methodically listen to and examine in detail communications intercepted via Title III wiretaps "in order to uncover the true meaning by deciphering any codes used in communication by drug traffickers to describe drugs, weapons, associates, activities, and law enforcement attempts to defeat intercept surveillance."  (*Id.* at 5.)

18.     The successful offeror would be required to provide Analytic Linguist support for intercept activities nationwide—24 hours a day, seven days a week, and accommodate support surges depending on DEA's volume of Title III operations.  (*Id.* at title page and 14.)

19.     The Solicitation indicated that Nationwide Linguist Services would be provided in response to individual call orders on an as-needed basis.  (*See id.* title page, 3, and 14.)

20. The Solicitation further provided for award on a best value basis using five factors:

---

[2] Citations herein to specific pages within cited exhibits refer to the pagination in the headers added in red text to the upper right-hand corner of the respective exhibits.

        a.   Factor 1 – Corporate Experience

        b.   Factor 2 – Past Performance

        c.   Factor 3 – Staffing Plan/Analytical Linguist Experience/Security Plan

        d.   Factor 4 – Quality Control Plan

        e.   Factor 5 – Price

(*Id.* at 25–27.)

21.    For Factor 1 – Corporate Experience, the Solicitation stated that the Agency would evaluate proposals as follows:

> The Government will assess its level of confidence of the Quoter's organizational experience demonstrating the Contractor's knowledge and ability to perform the duties and tasks reflected in the Statement of Work (SOW). This summary shall not exceed two (2) pages in length. **Real-time (live) experience** is required at the Corporate level. Specifically address work history to determine whether the Contractor has relevant work experience performing lawful **real-time (live) intercept work under real-world legal and operational constraints of the Title III of the Omnibus Crime Control and Safe Streets Act (18 U.S.C. § 2510) relevant to the SOW** specific task requirements and staffing accessibility. If the Quoter's experience is not federal experience, the Quoter must clearly demonstrate how its non-federal experience relates to the needs in the SOW. The Quoter must demonstrate the knowledge and understanding of the Government's need. In order to receive a rating of high confidence in Corporate Experience, quoters must demonstrate real-time (live) experience at the corporate level. Real-time (live) experience at the corporate level is required to be eligible for award.

(*Id.* at 25 (emphasis added).)

22.    For Factor 2 – Past Performance, the Solicitation stated that the Agency would evaluate proposals as follows:

7

The Government will assess its level of confidence of the Quoter's relevant past performance as it relates to the probability of successful accomplishments of the contract requirements.

Specifically, jobs that are of similar size (nationwide with the need to be filled within three (3) calendar days or sooner), **scope (real-time (live))** telephonic monitoring of court ordered nonconsensual intercepts (Title III), consensual listening devices and other media, and subsequent analysis and translation of recorded material), complexity (delivering accurate and high quality translation services for complex and sensitive material), contract type, and period of performance (POP) in relation to the requirements of this solicitation are of particular interest to the Government.  **The Quoter shall discuss in detail their performance under existing and prior contracts for relevant real-time (live) Title III services**, with an emphasis on information that demonstrates relevancy and quality of past performance relative to the size and complexity of the acquisition.

*Note:* In the case of a Quoter without a record of relevant past performance or for whom information on past performance is not available or so sparse that no meaningful past performance rating can be reasonably assigned, the Contractor will not be evaluated favorably or unfavorably on past performance.

Quoters without a record of relevant past performance or for whom information on past performance is not available or so sparse that no meaningful past performance rating can be reasonably assigned, the Contractor will not be evaluated favorably or unfavorably on past performance. Therefore, the Contractor shall be determined to have unknown past performance resulting in a rating of "Neutral Confidence."

(*Id.* at 25 (last emphasis in original).)

23.    For Factor 3 – Staffing Plan/Analytical Linguist Experience/Security Plan, the Solicitation stated that the Agency would evaluate proposals as follows:

The Government will assess its level of confidence of the Quoter's ability to provide a detailed staffing plan that outlines the number and qualifications of personnel required to fulfil the solicitation requirements.  For reference, one Full-Time Equivalent (FTE) is

defined as 2,080 hours.  Includes a breakdown of labor categories, and describe how personnel will be recruited, retained, trained, and allocated across all tasks outlined in the Statement of Work.  Include a plan to reduce and minimize TDY for other than English/Spanish, timeline for meeting security requirements, and ability to provide services nationwide.

The Government will assess its level of confidence that the Quoter will successfully perform the requirements based its submission on evidence of linguist experience, including specific certifications, language proficiency, and relevant experience to include Analysis, Monitoring Transcribing, Translating, Interpreting, Validation, Minimization, Management and Supervision.  The contract standard for minimum acceptable language proficiency is an assessment rating of 3 or above from the Interagency Language Roundtable (ILR) in speaking, listening, reading, and writing—for both the foreign language and English.  Provides at least one example of accomplishments to indicate the ability to implement the proposed methods and techniques for solving problems.

*Exotic languages* – are rare, unique, or outside the mainstream linguistic landscape of a particular area or community; not widely spoken.

The Government will assess its level of confidence of the Quoter's proposed Security Plan.  Specifically, the Government will assess the Contractor's ability to clearly define all aspects of the security requirements, as stated in the Statement of Work and solicitation, while providing a full staff of personnel with proper security clearances at all times.  The Government will evaluate the contractor's strategy for ensuring that all linguists and analysts assigned to the contract have successfully completed appropriate background investigation prior to performance.  The Government will assess the contractor's system for tracking security packages, language proficiencies, and non-disclosure agreements (ISR-8, DEA-487, DOJ/DEA Contractor Individual Agreement) prior to performance as well as the contractor's system for notifying the COR in advance whenever a linguist or analyst will cease performance, be reassigned, or change their marital status.

(*Id.* at 26–27 (emphasis in original).)

24. Section 3.1 of the SOW, among other portions, provided definitions/descriptions as to the analytic linguist services required:

> 3.1.1 Monitor. To listen to or read foreign language communications, lawfully intercepted, and perform immediate verbal summaries, then subsequent written or typed summaries, into the English language.
>
> 3.1.2 Transcribe. To render the spoken word of a language into the written form of the same language, then save the result on a Government-owned computer storage device and/or in printed format.
>
> 3.1.3 Translate. To render the spoken or written word of one language into the written form of another language, then save the results on a Government-owned computer storage device or other storage media and/or in printed format. Note: The register, style, and tone of the source language should be conserved.
>
> 3.1.4 Interpret. **To translate orally** either consecutively or simultaneously from one language to another.
>
> 3.1.5 Validate. A review conducted by someone other than the individual performing the original translation, transcription, or the quality control review of the specified original work in order to attest to the accuracy of the final work.
>
> 3.1.6 Summarize. To provide a typed, concise and accurate synopsis of oral or written communications intercept that contains the identity of the speakers or correspondents, and all locations and events mentioned that pertain to the subject of the communication.
>
> 3.1.7 Deconfliction Analysis. The process of cross-referencing target numbers, devices, and/or other associated information in one investigative case on the system with target numbers, devices, and/or other associated information in a separate investigative case on the system.
>
> 3.1.8 Standard English. Most widely accepted use of the English language in grammar, spelling, and vocabulary.

3.1.9 Voice Library. Library consisting of voice exemplar references where persons have identified themselves or been identified during a phone conversation. The exemplar is used for future voice comparisons.

3.1.10 Source Data. The class of data requiring linguist services. Classes of data are verbal or written. Verbal Source Data typically is derived from audio or video recordings. Written Source Data is typically derived from official documents, transcripts, emails, maps, etc.

3.1.11 **Minimization**. Legal instruction given by the Court or Prosecutor to the Analytic Linguist which identifies the types of "privileged" communications that the Analytic Linguist may not listen to and/or capture electronically.[3]

(*Id.* at 3–4 (emphasis added).)

25.     SOW Sections 3.2.1 through 3.2.8, further describe the details of the services the Analytic Linguists must be capable of providing such as Analysis, Monitoring, Transcribing, Translating, Interpreting, Validation, Minimizing, and Management and Supervision.  (*Id*. at 5-8.)

26.     For Factor 4 – Quality Control Plan, the Solicitation stated that the Agency would evaluate proposals as follows:

The Government will assess its level of confidence of the Quoter's Quality Control (QC) Plan.   Specifically, the Government will

---

[3] Minimization is an integral component of Title III that helps curtail the risk of unlawful searches.  Under federal law, "[e]very [wiretap] order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted *in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter*, and must terminate upon attainment of the authorized objective, or in any event in thirty days."  18 U.S.C. § 2518(5) (emphasis added).  Even before seeking authorization to conduct a wiretap, the Department of Justice's procedures for seeking a Title III wiretap require that the law enforcement affidavit submitted in support of the application include a minimization plan stating "how [the] wiretap will be minimized, tailoring to any specific facts of [the] investigation" and "[t]ailor[ing] the minimization plan for the type of intercept, i.e., wire, electronic."  *See* U.S. Dep't of Justice, "Criminal Resource Manual, Sec. 92, Title III Procedures – Attachment C," (Dec. 2008).

assess the internal quality control and inspection system, methods and procedures for correcting deficiencies, and proposed documentation.  The Government will also evaluate QC personnel proposed to perform the QC functions.

(*Id.* at 27.)

27.     For Factor 5 – Price, the Solicitation stated that the Agency would evaluate proposals as follows:

> Price will be evaluated in accordance with FAR 8.405-2(d).  Quotes should include the Quoter's best pricing, including all discounts.
>
> 1. Independent Government Cost Estimate (IGCE): Proposed prices will be compared to the IGCE, historical pricing data and quoters GSA pricing schedule to assess reasonableness.
>
> 2. Total Evaluated Price Calculation: Pricing for Labor-Hour BPAs under FAR Subpart 8.4 (Evaluation): To help select the best-value Quoter for this BPA opportunity, the Government will use the hourly rates from the BPA LCAT Pricing Rate Worksheet/Excel Spreadsheet.  The Government will apply those rates to an estimated number of hours for each labor category to arrive at a total evaluated price. Quoters shall submit the attached pricing worksheet.
>
> 3. Travel Costs Exclusion: The Government assumes no travel costs will be incurred against the resultant BPA. The Government will provide a plug-in value in Attachment C – Schedule of Supplies/Services – CLIN Pricing Worksheet for pricing purposes.
>
> 4. FAR 52.217-8: Option to Extend Services (NOV 1999) – In the event the BPA is extended through FAR clause 52.217-8 Option to Extend Services, pricing for Option Year Four (4) will be used.

(*Id.* at 26–27.)

28.     The Solicitation provided that, for each offeror, Factors 1 through 4 would be assigned confidence ratings of High Confidence, Some Confidence, or Low Confidence, except that for Factor 2 – Past Performance, a Neutral Confidence rating could also be used.  (*Id.* at 28.)

No confidence rating would be assessed for Factor 5 – Price, and "[a]n overall confidence rating w[ould] be determined by combining all factors." (*Id.*)  The Solicitation defined the confidence ratings as follows:

| | |
|---|---|
| **High Confidence** | The Government has a ***high confidence*** that the Quoter understands the requirement, proposes a sound approach, and will be successful in performing the contract with ***little or no*** Government intervention. |
| **Some Confidence** | The Government has ***some confidence*** that the Quoter understands the requirement, proposes a sound approach, and will be successful in performing the contract with ***some*** Government intervention. |
| **Low Confidence** | The Government has ***low confidence*** that the Quoter understands the requirement, proposes a sound approach, or will be successful in performing the contract ***even with*** Government intervention. |
| **Neutral Confidence** | Quoters without a record of relevant past performance or for whom information on past performance is not available or so sparse that no meaningful past performance rating can be reasonably assigned, the Contractor will not be evaluated favorably or unfavorably on past performance. Therefore, the Contractor shall be determined to have unknown past performance resulting in a rating of "Neutral Confidence." Neutral Confidence rating for past performance. 41 U.S.C. § 405(j)(2) and Federal Acquisition Regulation (FAR) 15.305(a)(2)(iv), ensures that the absence of past performance data does not disadvantage a quoter. |

(*Id.*)

29.     The Solicitation explained, with respect to the relative importance of the evaluation factors, as follows:

███████████████████████████████████

███████████████████████████    ████

13

> The evaluation factors are not equally weighted. Factor 1 (Corporate Experience) and Factor 2 (Past Performance) are of equal importance and when combined are more important than Factor 3 (Staffing Plan/Analytical Experience/Security Plan) and Factor 4 (Quality Control Plan) combined. Factor 5 (Price) is considered the least important compared to Factors 1 through 4. However in the absence of significant technical differences among quotes, the cost/price factor may become the determining factor for source selection. (*Id.* at 26–27.) The Solicitation reiterated that "[a]ll factors other than cost/price, when combined, [were] significantly more important than cost/price."

(*Id.* at 27.)

30.     The RFQ also included Wage Determination No. 2012-0012 (the "WD"), Revision No. 40, Date of Last Revision 12/03/2025. This WD is solely for the occupation code title of Analytic Linguist. (Ex. A-4 at 2.)

31.     During the DEA's most recent efforts to procure the Analytic Linguist services, the DEA provided two documents with respect to the historical number of hours performed by DEA region. Notwithstanding the differences in hours between the two documents, the DEA identified Los Angeles as utilizing the greatest number of Analytic Linguists of any of DEA's regions. (*See* Exs. A-8 and A-6.)

32.     Exhibit A-8 sets forth the historical language data for different DEA field divisions, including Los Angeles:

## Attachment A – Historical Language Data

### Historical Language Data

| Division | FY2022<br>10/1/21-9/30/22 | FY2021<br>10/1/20-9/30/21 | FY2020<br>10/1/19-9/30/20 | FY2019<br>10/1/18-9/30/19 | FY2018<br>10/1/17-9/30/18 |
|---|---|---|---|---|---|
| ATLANTA | 109,145.98 | 113,401.52 | 138,012.38 | 139,056.23 | 159,238.14 |
| BOSTON | 25,523.09 | 22,992.63 | 34,315.46 | 58,505.26 | 58,453.16 |
| CARIBBEAN | 2,211.96 | 0.00 | 237.36 | 2,355.30 | 2,387.12 |
| CHICAGO | 21,550.02 | 14,037.30 | 28,752.09 | 39,176.44 | 45,026.37 |
| DALLAS | 27,412.68 | 31,130.79 | 24,134.67 | 28,931.01 | 42,128.90 |
| DENVER | 46,640.65 | 50,979.64 | 66,200.59 | 57,689.79 | 79,025.53 |
| DETROIT | 14,981.72 | 20,627.29 | 31,184.50 | 34,462.45 | 32,630.98 |
| EL PASO | 6,076.00 | 3,726.49 | 8,729.40 | 19,891.58 | 21,016.11 |
| HOUSTON | 77,970.32 | 91,834.54 | 102,505.36 | 91,888.28 | 82,456.71 |
| LOS ANGELES | 224,728.25 | 221,221.53 | 241,759.26 | 252,015.31 | 289,069.46 |

(Ex. A-8 (highlighting added).)

33.     Exhibit A-6 provides the pricing worksheet for the same, including, as relevant below, a requirement to quote more than 140,000 hours of Spanish Language Analytic Linguists:

| LOCATION | | LOS ANGELES | | | |
|---|---|---|---|---|---|
| | CLIN | Hours | FTE's | Hourly Rates | |
| SPANISH LINGUIST | 0028 | 140000 | | | $      - |
| SPANISH LINGUIST-OT/HOLIDAY | 0029 | 3000 | | | $      - |
| ENGLISH LINGUIST | 0030 | 400 | | | $      - |
| ENGLISH LINGUIST - OT/HOLIDAY | 0031 | 20 | | | $      - |
| COMMON LANGUAGE | 0032 | 15 | | | $      - |
| COMMON LANGUAGE - OT/HOLIDAY | 0033 | 1 | | | $      - |
| EXOTIC LANGUAGE | 0034 | 15 | | | $      - |
| EXOTIC LANGUAGE-OT/HOLIDAY | 0035 | 1 | | | $      - |
| SUPERVISORY | 0036 | | | | $      - |
| TOTALS | | 143452 | 69 | | $      - |

(Ex. A-6)

34.     The Solicitation required offerors to submit all questions by January 23, 2026.  (Ex. A-1 at 18.)

35.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

36.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

37.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

38.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████



41.     On February 7, 2026, the Agency issued Amendment 6 to the Solicitation.  The Agency included its answers to offerors' questions in a Questions and Answers ("Q&A") form attached to the final conformed copy of the Solicitation on February 6, 2026.  (*See* Ex. A-2.)

42.     In response to two offerors' questions requesting the number of hours that would be used to calculate the Total Evaluated Price ("TEP"), Questions 1 and 5, the Agency clarified that offerors "only submit labor rates which the Government applies to a predetermined number of hours (not seen by the vendors) in order to arrive at a total evaluated price for each vendor." (*Id.* at 1, 3.)

43.     The Agency clarified in response to another question, Question 7, that "DEA will use <u>Rates Only Pricing (ROP)</u> procurement evaluation method where vendors submit only labor rates for specific categories, rather than total project prices." (*Id.* at 3 (emphasis in original).)

44.     Question 9 noted the removal of the Solicitation's requirement for offerors to propose a supervision plan, and responded to the following question: "Can you please clarify how DEA intends to verify that a company will provide sufficient and effective supervision of all TIII [Title III] monitoring projects?" (*Id.* at 4.) The Agency responded:

> The DEA does not require onsite supervision. The Contractor is responsible for establishing and implementing a Quality Control Plan that includes appropriate measures to meet project objectives, which may include on-site supervision at the Contractor's discretion. All supervision, if deemed necessary by the Contractor, shall remain under the control and direction of the Contractor.
>
> A fully loaded labor rate for Blanket Purchase Agreements (BPAs) typically includes supervision, as it covers the total cost of employment, including base salary, payroll taxes, benefits, overhead (which includes indirect labor like supervisors), and profit. These rates ensure all indirect expenses, such as management and project oversight, are factored into the hourly price charged to the government.
>
> Key Components of Fully Loaded Rates for BPAs:
>
> - Overhead: This category usually includes costs for supervision, administrative personnel, and other indirect support staff.
>
> - Indirect Costs: Expenses such as fringe benefits, insurance, and payroll taxes are included alongside direct salary costs.
>
> - Contractual Coverage: The fully loaded (or "burdened") rate is designed to cover all costs associated with providing a service to a contract, including supervision to ensure quality.

> While supervisor wages themselves might not be directly billed to a specific task, their time is included within the overhead percentage or general and administrative (G&A) rate applied to the direct labor cost.
>
> Therefore, the solicitation has been amended to remove the supervisory CLIN and Supervisory Methodology as an evaluation factor. Additionally, the pricing spreadsheet and evaluation have been amended to include Rates Only Pricing for Evaluation. These changes will result in a more realistic price evaluation amongst all quoters.

(*Id.* at 4–6.)

**B.** ███████████████████████████████████████████████████

45. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

46. ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

47. ████████████████████████████████████████████

████████████████████████████████████████████████████████

 

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

19



48. ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████

49. ███████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████

_____
████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████████
██████████

20



50.

51.

52.

53.

54. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

55. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

56. On February 3, 2026, as noted above, the Agency amended the Solicitation, Amendment 5, to remove supervisory methodology from its evaluation and to revise the price evaluation to be based on fully burdened labor rates only. (*See* Ex. A-3 at 4; Ex. A-7.) ▮▮▮

### C. Quote Submission, Award Decision, and Brief Explanation

57. Metlang timely submitted its quote for consideration by the Agency.

58. On March 13, 2026, the Agency notified Metlang that it had selected SOSi for award. (Ex. B-1.)

59. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

60.     The Agency disclosed that SOSi had a TEP of $188,658,590.02.  (*Id.*)

61.     On March 16, 2026, Metlang requested a brief explanation of the award decision in accordance with FAR 8.405-2(d).  (Ex. B-2.)

62.     The same day, the Contracting Officer informed Metlang that it would receive no additional information regarding the award decision.  (Ex. B-3.)

**D.      Metlang's Initial Pre-Filing Notice and the Agency's PIA Investigation**

63.     On March 20, 2026, Metlang provided its pre-filing notice to the Clerk of Court of the Court of Federal Claims stating its intent to file a bid protest on or about March 23, 2026 in accordance with Appendix C. II, Requirement for Pre-Filing Notice.

64.     On March 23, 2026, Assistant Director of the Department of Justice, Commercial Litigation Branch, National Courts Section, Steven Mager ("DOJ"), acknowledged the receipt of the Pre-Filing Notice and asked to discuss the case before Metlang filed.  ███████

████████████████████████████████████████████████

████████████████████████████████████████████

65.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

66.     DOJ responded to advise counsel that the DEA would be issuing an extension "forthwith" to Metlang for its incumbent contract.

████████████████████████████████████████████████

███████████████████████████████████████████

███████

67.    On March 24, 2026, during a conference call, DOJ advised counsel that it had instructed the DEA to investigate the PIA violation, issue a stop work order to SOSi and issue an extension until April 30, 2026.

68.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

69.    On June 26, 2026, the DEA sent an email to Metlang to advise Metlang that it would be lifting the stop work order to SOSi as of August 1, 2026 and that it was issuing one-month BPAs to Metlang for it to continue its performance through July 31, 2026.  (*See* Ex. G.)

70.    On June 29, 2026, DOJ counsel provided Metlang counsel with a copy of the DEA's Final Linguist PIA Investigation Decision which concluded that no PIA violation had occurred.

71.    As of the time of this filing, Metlang understands, based on its exchanges with DOJ, that the Agency will extend Metlang's contract until August 31, 2026.  As a result, Metlang and SOSi would overlap in performance by at least one month.  (*See* Ex. G.)

72.    This protest follows.

## COUNT I

## VIOLATION OF THE PROCUREMENT INTEGRITY ACT (41 U.S.C. § 2102)

73.    The allegations of paragraphs 1 through 72 are hereby incorporated by reference.

74.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

███████

75.    ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████

76.    ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

██████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████

25

77.    The Federal Acquisition Regulation ("FAR") provides that "[a] contracting officer who receives or obtains information of a violation or possible violation" ██████████ "must determine if the reported violation or possible violation has any impact on the pending award or selection of the contractor."  FAR 3.104-7(a).  From there, the contracting officer is required to document the determination whether there is no impact on the procurement and proceed with the procurement, with the concurrence of another individual designated by the agency; or the contracting officer or individual designated by the agency must forward the information to the agency head of contracting activity ("HCA").  *Id.* 3.104-7(a)(1), (2).  If the information is forwarded to the HCA, the FAR requires the HCA to determine whether to continue with the procurement, to investigate, to "[c]onclude that a violation occurred," or to take other "appropriate action," and if the HCA determines that a violation of the PIA has occurred, to take action such as canceling the procurement or disqualifying the offeror, if a contract has not been awarded, or such as seeking contractual remedies, voiding or rescinding the contract, or referring the matter for suspension and debarment, if a contract has been awarded.  *Id.* 3.104-7(b), (d).

78.    The PIA provides that no person may file a protest at the Government Accountability Office ("GAO") alleging a violation of the PIA "unless the person, no later than 14 days after the person first discovered the possible violation, reported to the Federal agency responsible for the procurement the information that the person believed constitutes evidence of the offense."  41 U.S.C. § 2106.  The United States Court of Appeals for the Federal Circuit has applied this 14-day requirement to protests brought in the United States Court of Federal Claims as well, reasoning that "[i]t would be incongruous to bar later GAO protests but to permit a later

court challenge." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 (Fed. Cir. 2012) (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007)).

79.    Metlang satisfied the statutory requirement to "report" the PIA violation to the Agency within 14 days

80.    Recent case law of this Court favors Metlang's position.  In *Insight Public Sector, Inc. v. United States*, 161 Fed. Cl. 760 (2022), the protestor followed its initial PIA allegation with an additional alleged PIA violation, which the protestor claimed it had brought to the attention of the contracting agency via an email.  *Id.* at 813.  However, the Court determined that the email "merely raised a generalized, 'potential' concern," which was "insufficient to trigger" the PIA procedures.    *Id.*  Thus, Metlang's notice was sufficient to trigger the Agency's obligation to engage PIA procedures, and met the 14-day requirement to preserve Metlang's protest ground.

81.    Despite Metlang immediately bringing the Agency's violation of the PIA to its attention, the Agency did not take any of the actions which FAR 3.104-7 indicates it could take.

Although the FAR contemplates "withhold[ing] award," "cancel[ing] the procurement," and "disqualify[ing] an offeror," as well as "any other appropriate actions," the Agency took no such "appropriate" action to ameliorate the impact ████████████████████████ Indeed, it is evident that the Agency failed to address ███████████████████████ ███████ as it forged ahead with the procurement, making award to an offeror which, as discussed more fully below, was demonstrably inferior to Metlang with respect to corporate experience and past performance—the two most important evaluation factors under the final conformed Solicitation. Furthermore, the Agency ignored the fact that SOSi's GSA MAS contract does not offer an analogous unified labor category that meets all of the RFQ's requirements for an Analytic Linguist and thereby does not qualify for an award against its GSA MAS contract. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

82.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████   ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████



83.



84.



85. ███████████████████████████████████████████

86. ███████████████████████████████████

31

87. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

88. For these reasons, the Court should sustain this protest. Further, the Court should craft a remedy ████████████████████████████████████████ namely, to hold unlawful and set aside the award to SOSi; to enjoin the Agency from moving forward with the BPA as awarded; to enjoin the Agency from canceling the procurement; to direct the Agency to conduct a legally sufficient investigation into the disclosure and its effects on the procurement; and to disqualify from competition for the National Linguist BPA requirement SOSi and any other offeror(s) ████████████████████████████████████████

███████████████████

89. Finally, the Court should direct the Agency to proceed with a new evaluation consistent with the terms of the Solicitation and consistent with the statutory and regulatory requirements for procurement integrity.

## COUNT II

### FAILURE TO DETERMINE WHETHER SOSI'S GSA MAS CONTRACT OFFERED LABOR CATEGORIES THAT MET THE RFQ'S REQUIREMENTS

90. The allegations of paragraphs 1 through 89 are hereby incorporated by reference.

91. Under FAR 8.4, an agency may award a BPA to eligible suppliers with contracts in the GSA's MAS program for the applicable NAICS code and Special Item Number ("SIN"). Suppliers submitting quotes in response to an RFQ limited to competition among GSA MAS

████████████████████████████████████████████

████████████████████████████████████████████

██████████

contract holders are limited to proposing only the services currently offered under their GSA MAS contracts.

92.     The Agency failed to determine that Title III and linguist services offered by SOSi under its GSA MAS contract met the RFQ's stated **unified** Analytic Linguist requirements, including, but not limited to specific certifications, language proficiency, and relevant experience to include Analysis, Monitoring, Transcribing, Translating, Interpreting, Validation, Minimization, Management and Supervision.

93.     The Agency failed to validate the experience required by the RFQ against SOSi's Title III labor categories where such categories require zero minimum experience at all.

94.     The Agency failed to determine whether SOSi's GSA MAS contract Title III-specific categories on its GSA MAS contract (A024, A026, A027) included oral interpretation in addition to minimization.  The described workflow for these SOSi labor categories is exclusively: listen and produce written English outputs (synopses, transcriptions, translations).  There is no discernible capability that SOSi's Title III-specific labor category personnel can conduct direct communication, whether face-to-face or otherwise, and between languages as required by the RFQ. (*See generally* Ex. F.)

95.     The Agency likewise failed to determine whether SOSi's GSA MAS contract limited Linguist/Analyst I-IV to performing work at a "contractor facility" vs. "government facility," had the RFQ's specified Title III oral interpretation capability requirements, and had minimization experience/qualifications.  (*See id.*)

96.     Furthermore, SOSi's GSA MAS contract confirms that their offered labor categories for Title III and Linguist/Analyst personnel are readily distinguishable from the DEA's requirements.  Specifically, their GSA MAS contract shows that its offered positions are aligned to WDs *other than* the Analytic Linguist WDs referenced above at paragraph 30.  (*See* Ex. H at 1.)

97.     But for the Agency's failure to evaluate whether the single, labor category proposed by SOSi from its GSA MAS contract met all of the RFQ's stated requirements for the RFQ's unified Analytic Linguist labor category, the Agency would have recognized that any labor category quoted by SOSi did not meet the RFQ's requirements, and Metlang likely would have had a substantial chance of being determined the best value offeror and awarded the BPA.

98.     For these reasons, the Court should sustain this protest.

**COUNT III**

**IRRATIONAL EVALUATION OF SOSI'S PAST PERFORMANCE**

99.     The allegations of paragraphs 1 through 98 are hereby incorporated by reference.

100.    The Agency irrationally evaluated SOSi's past performance because SOSi's past performance history does not meet the Solicitation's requirements for Analytic Linguists.[5]

101.    While procuring agencies are afforded discretion in their evaluation of offerors' past performance, those evaluations must be rational and consistent with the terms of the operative

---

[5] ████████████████████████████████████████
████████  SOSi presumably, and unreasonably, received a "High Confidence" rating for its past performance given that the Solicitation stated that "[a]n overall confidence rating will be determined by combining all factors."  (Ex. A-1 at 28.)

solicitation.  *See, e.g.*, *Mortg. Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 125, 129–30 (2021).

102.   The Solicitation here required offerors to demonstrate relevant past performance of similar size (nationwide); scope (corporate-level experience with live telephonic monitoring of court-ordered Title III intercepts, and subsequent analysis and translation of recorded material); complexity (high-quality translation services for complex and sensitive material); contract type; and; period of performance.  (Ex. A-1 at 20.)

103.   The Solicitation emphasized the specific need for experience with providing real-time Analytic Linguist support to Title III operations.  (*Id.*)

104.   Offerors were instructed to "discuss in detail their performance ***under existing and prior contracts for relevant real-time (live) Title III services***, with an emphasis on information that demonstrates relevancy and quality of past performance relative to the size and complexity" of DEA's requirement.  (*Id.* (emphasis added).)

105.   Offerors had to submit a minimum of three contracts or task orders comparable in size, scope, and complexity existing or completed during the past three years.  (*Id.*)

106.   To receive a "High Confidence" rating for past performance, offerors had to demonstrate "real-time (live) [Analytic Linguist] support of live real-time intercepts[.]"  (*Id.* at 20–21.)

107.   Metlang is a veteran contractor with twenty years of experience performing different iterations of what has become DEA's current Title III Analytic Linguist requirement.

█████████████████████████████████████████████████

████████████████████████████████████████████    ████

108.    As such, Metlang is intimately familiar with Title III linguistic support requirements across federal law enforcement agencies and the insular cohort of contractors supporting those requirements.

109.    From its knowledge and experience in the space, the federal law enforcement agencies that primarily conduct wiretap operations pursuant to Title III are, in descending order of volume of usage, the DEA, Immigration and Customs Enforcement ("ICE"), Federal Bureau of Investigation ("FBI") (ordinarily using independent consultants, not contractors), and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), with DEA being the only law enforcement agency utilizing the specialized "Analytic Linguist" labor category.

110.    From its knowledge and experience with Title III operations, business intelligence on its competitors including SOSi, and publicly available federal contracting information, SOSi likely relied on three experiences to try to demonstrate sufficient past performance (and corporate experience, discussed further below) to receive the award contested here: (1) indefinite delivery, indefinite quantity ("IDIQ") contract number 15JPSS20D00000366 awarded by DOJ's Executive Office of Immigration Review ("EOIR") (the "EOIR contract"); (2) BPA number 15DDHQ23A00000007 awarded by DEA's Special Operations Division ("SOD") (the "SOD BPA"), and; (3) BPA number 15A00021AAQA00112 awarded by ATF (the "ATF BPA").

111.    None of these three experiences satisfies the Solicitation's requirement for past performance of similar size, scope, and complexity providing real-time (i.e., live) Analytic Linguist support to Title III intercept operations.  Metlang addresses each in turn below.

**The EOIR Contract**

36

112.    SOSi was awarded the EOIR contract on or about September 1, 2020 for a combined total potential award amount of $309.4 million.   (*See* IDIQ Contract No. 15JPSS20D00000366,

https://www.usaspending.gov/award/CONT_IDV_15JPSS20D00000366_1501   (last   accessed July 8, 2026).)[6]

113.    The EOIR contract was awarded pursuant to solicitation number 15JPSS20R00000017 (the "EOIR solicitation").  (*See* Ex. D-10.)

114.    The requirement described in the EOIR solicitation is wholly detached from the Analytic Linguist requirement in support of Title III collection operations contemplated in the Solicitation here.  (*See generally id*.)

115.    SOSi's EOIR contract is exclusively for interpreter services at immigration proceedings.  (*See id*. at 4-5.)

116.    The EOIR solicitation makes no mention whatsoever of Analytic Linguists, wiretaps, or even Title III operations generally.  (*See generally id*.)

117.    The EOIR solicitation only required past performance experience "under similar contracts with the Federal Government for interpretation services,"—***not*** real-time Analytic Linguist support for Title III wiretap operations which the RFQ made clear was a non-negotiable requirement.  (Ex. A-1 at 20.)

---

[6] The EOIR contract is a recurring requirement for which SOSi received a follow-on award, contract number 15JPSS26D00000142, on or about February 1, 2026.  The requirements under that follow-on contract are identical to the translation services required under the EOIR contract. *See generally* Exs. D-1 & D-2.

118.    Any doubt that DEA's Analytic Linguist requirement under the Solicitation here is distinct from the interpreter requirement in SOSi's EOIR contract is resolved by reference to Department of Labor ("DOL") Wage Rate Determinations ("WD") for the Analytic Linguist position.

119.    In 2012, during a prior iteration of the DEA's requirement for Analytic Linguists (for which Metlang was contracted with DEA), DEA requested and received a WD from DOL specifically for the Analytic Linguist occupation, separate and distinct from other linguistics-related occupations.  (*See generally* Ex. A-5.)

120.    DEA requested the WD for the Analytic Linguist position as a unique profession meriting higher wages due to the complexity of the analysis required in real-time.

121.    The 2012 WD (No. 2012-0012) noted the duties unique to Analytic Linguists to "listen to or read foreign language communications, lawfully intercepted" (e.g., collected pursuant to an approved Title III application), "to perform immediate verbal summaries" in support of law enforcement operations, and "then [prepare] subsequent written or type[d] summaries into [the] English language."  (*Id*. at 7.)

122.    The most recent revision of the WD for Analytic Linguists, dated December 3, 2025 (Ex. A-4), and included as part of the Solicitation here, retains the same functional description and is readily identifiable with the sort of Title III operations requirements at issue.

123.    By contrast, the interpreters required under SOSi's EOIR contract merely need to possess "a high-level of interpretation skills and proficiency" in English and the non-English

38

language for which they would provide interpretation services during immigration court proceedings. (Ex. D-10 at 8–9.)

124. For these reasons, the EOIR contract is patently incomparable in scope to the Solicitation's requirements, even if it is technically nationwide and has a high dollar-value ceiling.

125. As such, SOSi's EOIR contract reference was insufficient to demonstrate past performance of the size, scope, and type required by the Solicitation here.

126. At best, then, the EOIR contract merited a "Neutral" rating under the Solicitation's terms.

127. The Agency's evaluation of SOSi's past performance likely relying on the EOIR contract was therefore irrational.

**SOD BPA**

128. SOSi's likely SOD BPA reference is also readily distinguishable from the Analytic Linguist requirement contemplated in the Solicitation here.

129. The SOD BPA was awarded to SOSi on or about July 1, 2023 with a ceiling of $20 million—only 9.7% of SOSi's awarded price here. (*See* BPA No. 15DDHQ23A00000007, https://www.usaspending.gov/award/CONT_IDV_15DDHQ23A00000007_1524 (last accessed July 8, 2026.).)

130. The SOD BPA was awarded pursuant to solicitation number 15DDHQ23R00000001 (the "SOD solicitation"). (*See* Ex. D-3.)

131. Unlike the Solicitation here, which is explicit in its requirement for Analytic Linguists to specifically support Title III collection operations, the SOD solicitation more

generically required "contractor personnel [to] monitor, transcribe, translate, review, and analyze investigative documents, electronic media, and communications." (Ex. D-4 at 1.)

132.    The SOD solicitation also differed from the Solicitation here in terms of the personnel required. (*Id*. at 8.)

133.    Whereas the Solicitation here specifically requires Analytic Linguists—a unique labor category subject to its own DOL WD, as discussed above—the SOD solicitation required "qualified Linguists, Linguistic Supervisors, Linguistic Analysts, and Intelligence Analysts." (*Id*.)

134.    "Analytic Linguists" are not mentioned anywhere in the SOD solicitation. (*See generally id*.)

135.    Nor are Analytic Linguists covered by the WDs incorporated into the SOD solicitation. (*See* Ex. D-3 at 28 (incorporating wage determinations); *see generally* Exs. D-5, D-6, & D-7.)

136.    Additionally, whereas the Solicitation here contemplates a nationwide requirement, the SOD BPA is primarily performed in Fairfax County, Virginia. (*See* Ex. D-4 at 22.)

137.    Moreover, it is Metlang's understanding that the SOD BPA is not performed like the sort of domestic court-authorized Title III wiretap operation contemplated in the Solicitation here; instead, on the SOD BPA, SOSi performs pre-investigation translations of calls that, as relevant, are relayed to various federal law enforcement agencies for use in establishing probable cause to undertake future investigative activity.

138.    Considering the foregoing differences in size, scope, and complexity, the SOD BPA is patently incomparable in scope to the Solicitation's requirements here.

139.    As such, SOSi's SOD BPA reference was insufficient to demonstrate past performance of the size, scope, and type required by the Solicitation here.

140.    At best, then, the SOD BPA merited a "Neutral" rating under the Solicitation's terms.

141.    The Agency's evaluation of SOSi's past performance likely relying on the SOD BPA was therefore irrational.

**ATF BPA**

142.    As with the EOIR contract and the SOD BPA, SOSi's ATF BPA likely reference is also readily distinguishable from the Analytic Linguist requirement contemplated in the Solicitation here.

143.    The ATF BPA was awarded on or about March 25, 2021 in the combined potential amount of $6.6 million—merely 3.5% of the SOSi awarded price here.   (*See* BPA No. 15A00021AAQA00112,

https://www.usaspending.gov/award/CONT_IDV_15A00021AAQA00112_1560 (last accessed July 8, 2026).)

144.    The ATF BPA was awarded pursuant to solicitation number 15A00020R00000009 (the "ATF solicitation").  (*See* Ex. D-8.)

145.    Like the SOD solicitation discussed above, while the ATF solicitation made passing references to Title III, its description of ATF's objective referred to more generic "language-related services including monitoring, interpretation, translation and transcription services."  (Ex. D-9 at 1.)

146. The ATF solicitation specifically required linguists, not *Analytic Linguists*, which, as noted, are a separate and distinct occupation with the DEA's own DOL WD. (Ex. D-9 at 8.)

147. Indeed, nowhere does the ATF solicitation even refer to Analytic Linguists like those required under the Solicitation here.

148. Further underscoring the difference in the requirements, the ATF solicitation incorporated WD 1987-0989 which, to Metlang's knowledge, does not incorporate or apply to Analytic Linguists.

149. Considering the foregoing differences in size, scope, and complexity, the ATF BPA is patently incomparable in scope to the Solicitation's requirements here.

150. As such, SOSi's ATF BPA reference was insufficient to demonstrate past performance of the size, scope, and type required by the Solicitation here.

151. At best, then, the ATF BPA merited a "Neutral" rating under the Solicitation's terms.

152. The Agency's evaluation of SOSi's past performance likely relying on the ATF BPA was therefore irrational.

153. Considering the foregoing, had the Agency rationally evaluated SOSi's past performance, it would have concluded that SOSi's references are not comparable to the requirements here and would have assigned a "Neutral" rating, at best.

154. Metlang was prejudiced by the Agency's erroneous evaluation of SOSi's past performance.

155.    Had the Agency rationally evaluated SOSi's past performance, it likely would have been rated less favorably than Metlang, which has decades of experience on the very requirement at issue.

156.    But for the Agency's flawed evaluation of SOSi's past performance, Metlang likely would have been identified as the best value offeror and had a substantial chance of being awarded the contract.

157.    The Court should therefore sustain the protest.

## COUNT IV

## IRRATIONAL EVALUATION OF SOSI'S CORPORATE EXPERIENCE

158.    The allegations of paragraphs 1 through 157 are hereby incorporated by reference.

159.    The Agency irrationally evaluated SOSi's corporate experience because SOSi's corporate history does not meet the Solicitation's requirements for Analytic Linguists.

160.    While procuring agencies are afforded discretion in their evaluation of offerors' corporate experience, those evaluations must be rational and consistent with the terms of the operative solicitation. *Cf. Mortg. Contracting Servs.*, 153 Fed. Cl. at 125, 129–30.

161.    The Solicitation's corporate experience requirements are nearly identical to the past performance requirements discussed above.

162.    In pertinent part, the Solicitation required offerors to address, in a brief summary not to exceed two pages, "work history indicating the Contractor has relevant work experience performing lawful real-time (live) intercept work under real-world legal and operational constraints of" Title III of the Safe Streets Act. (Ex. A-1 at 20.)

163.    Corporate experience would be evaluated on the breadth and depth of experience on Analytic Linguistic services under Title III, specifically, in size, scope, and complexity to those required by the Solicitation. (*Id*. at 21.)

164.    For the reasons explained in paragraph 110 above, and given the overlap between the Solicitation's past performance and corporate experience requirements, SOSi's corporate experience summary likely showcased the same EOIR contract, SOD BPA, and ATF BPA discussed above.

165.    For the same reasons discussed in Count III, above, none of those experiences could satisfy the Solicitation's requirement to demonstrate corporate experience with the sort of Analytic Linguist service in support of Title III collection operations at issue here.

166.    As noted, the EOIR contract differs from the instant requirement in several notable respects.

167.    The EOIR requirement is for interpreters at immigration court proceedings, not Analytic Linguists supporting Title III operations in real time. (*See* Ex. D-1.)

168.    The interpreters required under SOSi's EOIR contract perform a different function than the Analytic Linguists required here, as demonstrated by the description in the WD DEA requested for the position in 2012. (*See* Ex. A-5.)

169.    Likewise, the SOD BPA also differs from the instant requirement in several key respects.

170.    The SOD BPA is primarily performed in Fairfax County, VA, not nationally, and the total value ceiling is a mere $20 million—only 9.7% of SOSi's awarded price here.

171. The linguistic services performed under the SOD BPA are also not Analytic Linguist services; instead, SOSi's linguists perform a preliminary translation function to assist federal law enforcement in building probable cause for future investigative activities, as opposed to assisting with court-authorized Title III wiretap operations.

172. The ATF BPA is also readily distinguishable.

173. Like the SOD BPA, the ATF BPA is significantly smaller in scope than the requirement here at only $6.6 million, and does not involve Analytic Linguist services in support of Title III operations.

174. Considering the differences between SOSi's likely corporate experience references and the requirements here, SOSi could not have demonstrated corporate experience satisfying the Agency's requirement that offerors have "relevant work experience performing lawful real-time (live) intercept work under real-world legal and operational constraints of Title III." (*See* Ex. A-1 at 20.)

175. As such, had the Agency rationally evaluated SOSi's corporate experience, the highest rating it could have received would have been a "Neutral" rating.

176. Metlang was prejudiced by the errors in the Agency's corporate experience evaluation.

177. But for the errors in the Agency's evaluation, Metlang likely would have had a substantial chance of being determined the best value offeror and awarded the contract.

178. Accordingly, the Court should sustain the protest.

**COUNT V**

████████████████████████████████████████████

████████████████████████████████████████████

████████

45

## FAILURE TO CONDUCT PRICE REALISM ANALYSIS

179. The allegations of paragraphs 1 through 178 are hereby incorporated by reference.

180. The Court has explained that "an agency may use a price realism analysis 'to measure an offeror's understanding of the solicitation requirements, or to avoid the risk of poor performance from a contractor who is forced to provide goods or services at little or no profit.'" *KWR Constr., Inc. v. United States*, 124 Fed. Cl. 345, 356 (2015) (quoting *Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 438 (2015)).

181. Even if a solicitation does not specify *how* an agency will conduct a price realism analysis, when a solicitation provides that the agency will conduct a price realism analysis, the agency is required to make such analysis, and such analysis must be "consistent with the evaluation criteria set forth" in the solicitation and must not "introduce new requirements outside the scope" of the solicitation." *CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 739–40 (2021) (quoting *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009)). Where the agency has failed to document its analysis of price realism consistent with the solicitation, the Court has sustained the protestor's challenge and enjoined the Agency from proceeding with the award. *Id.* at 744.

182. In its Q&A with offerors released with the final, conformed copy of the Solicitation, the Agency explained its decision to require offerors to submit only a fully loaded labor rate for each CLIN as "ensur[ing] all indirect expenses, such as management and project oversight, and any temporary duty ("TDY") costs that may be required to support the contract are factored into

46

the hourly price charged to the government," and explained that "[t]hese changes will result in a more realistic price evaluation amongst all quoters." (Ex. A-2 at 5–6.)

183. The Agency's Q&As expressed an intent to engage in a "realistic" evaluation of offerors' prices, in effect requiring offerors to demonstrate in their fully loaded labor rates—the only price information that would be provided to the Agency—an understanding of the Solicitation's performance requirements including indirect costs which might, in other evaluations, be separated out from direct labor rates.

184. Due to its two-decade-long history as an incumbent performer of the linguist services being sought by the Solicitation, Metlang has a unique understanding of the performance requirements at issue and has intimate knowledge of the margins in which a business in this field can operate while still being profitable. In particular, as the current incumbent provider of the linguist services being procured, ███████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████—something that Metlang's competitors, including SOSi, did not have and could not have factored into their quotes.

185. SOSi's lowball quote ███████████████████████ betrays SOSi's unawareness of recent historical and current trends in Agency demand, representing a flawed conception of the amount of work on offer. Based on historical data provided by the Agency and the declining usage trend in Agency demand, at the significantly discounted rates it proposed, SOSi's ability to provide services to the DEA as required by the RFQ's Statement of Work will be severely compromised as a direct result of SOSi's unrealistic quote. Specifically, SOSi will not

████████████████████████████████████████
████████████████████████████████████████
███████

47

be able to provide adequate management and administration as a result of its gross miscalculation of the true overhead and indirect costs that are actually required to perform the Analytic Linguist services required by the RFQ's Statement of Work and successful performance of the calls issued under the BPA will be jeopardized.

186.    As is evident from the Agency's decision to award to SOSi despite SOSi's evident lack of understanding of the requirements of performance, the Agency simply failed to undertake a price realism analysis as it indicated it would during the Q&A.

187.    Failure to conduct a required price realism analysis is grounds for the Court to enjoin the Agency from proceeding with the BPA as awarded. *See CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. at 744.   Because the Agency here has failed to make an evaluation of the realism of SOSi's fully loaded labor rates, the Court must enjoin the Agency from proceeding with the BPA awarded to SOSi.

188.    Had the Agency conducted the required price realism analysis, the Agency would have determined that SOSi's proposed labor rates represented a lack of understanding of the actual costs of performance and presented a risk that, due to greater costs as a result of lower volumes, SOSi will ultimately not have the ability to  successfully perform the Analytic Linguist Services required by the RFQ SOW.

189.    Metlang was prejudiced by the failure of the Agency to conduct the required price realism analysis.

190.    But for the Agency's failure to conduct the required price realism analysis, the Agency would have recognized that SOSi quoted an unrealistic price which presented an

48

intolerable risk of performance failure, and Metlang likely would have had a substantial chance of being determined the best value offeror and been awarded the contract.

191.    For these reasons, the Court should sustain this protest.

## COUNT VI

### FLAWED BEST VALUE DETERMINATION

192.    The allegations of paragraphs 1 through 191 are hereby incorporated by reference.

193.    As set forth more fully above, the Agency made the decision to award the BPA to SOSi despite significant errors, including (i) that the Agency failed to remedy its violation of the PIA, ███████████████████████████████████████████████████████

███████████████████████████████ ; (ii) that SOSi's GSA MAS contract did not offer labor categories that are analogous to the RFQ's uniform Analytic Linguist labor category and its requirements; (iii) that all sources of potential past performance for SOSi are inapplicable and SOSi should merit, at best, a Neutral Confidence past performance rating; (iv) that SOSi lacked the required breadth and depth of corporate experience performing Analytic Linguist services; and (v) that the Agency failed to conduct the required price realism analysis.

194.    The Agency's determination to overlook these flaws and determine that SOSi represented the best value was inherently flawed.

195.    Although agencies are afforded discretion in conducting best value determinations, that discretion must be rationally exercised and consistent with the Solicitation.

196.    The Agency ignored explicit requirements to conduct price realism determinations, arbitrarily ignored distinctions in past performance and corporate experience between the

incumbent contractor Metlang and the less-experienced SOSi, failed to verify whether any labor category offered by SOSi met the explicit requirements of the RFQ, and violated the requirements of the PIA ████████████████████████████████████████.

197.    Thus, the Agency's determination of best value was neither rational nor consistent with the requirements of the Solicitation.

198.    Metlang was prejudiced by the Agency's errors in conducting the best value determination.

199.    But for the Agency's errors, Metlang likely would have had a substantial chance of being determined the best value offeror and been awarded the contract.

200.    Accordingly, the Court should sustain the protest.

## BASIS FOR INJUNCTIVE RELIEF

201.    The allegations of paragraphs 1 through 200 are hereby incorporated by reference.

202.    As demonstrated above, Metlang will succeed on the merits of this protest because the Agency acted arbitrarily, capriciously, and contrary to law in evaluating Metlang and SOSi's proposals and in determining that SOSi represented the best value.

203.    Absent an injunction, Metlang will be immediately and irreparably harmed by the lost opportunity to compete for award of the BPA due to the Agency's arbitrary and unlawful evaluation.

204.    The balance of harms favors Metlang.  The Agency will not be harmed by complying with procurement law.  Because SOSi has yet to begin performing, and because the Agency will continue to receive the required services from Metlang as the incumbent, the relief

50

Metlang seeks would serve merely to maintain the status quo while the Agency conducts a lawful procurement.

205.    The public interest will be best served by upholding the integrity of the procurement as it will ensure that the Agency will not be permitted to conduct an irrational evaluation of quotes, violate the PIA, or award a contract based on a flawed best value determination.  Allowing the Agency's decision to stand would instead frustrate the public interest in the fairness and open competition of the public procurement system and diminish the public's trust in the government contracting system.

## PRAYER FOR RELIEF

WHEREFORE, Metlang respectfully requests that this Court:

i.    Declare that the Agency's evaluation of SOSi's quote and Metlang's quote, and the resulting decision not to make award to Metlang, was arbitrary, capricious, irrational, and contrary to law.

ii.   Issue such preliminary and permanent injunctions as are necessary to prevent the Agency from proceeding with the Nationwide Linguist BPA as currently awarded.

iii.  Issue such preliminary and permanent injunctions as are necessary to direct the Agency to re-evaluate the quotes and make a new award determination consistent with the Solicitation.

iv.   Award bid preparation costs to Metlang.

v.    Order such other and further relief as the Court deems just and proper.

Dated: July 8, 2026

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

*/s/* Holly A. Roth

Holly A. Roth, Attorney of Record
1650 Tysons Blvd, Suite 1700
Tysons, VA 22102
Phone: (703) 720-8576
Facsimile: (703) 720-8610
E-mail: holly.roth@hklaw.com

*Counsel for Metlang LLC*

Of Counsel:

John M. McAdams III
Tanner N. Slaughter
Ben R. Smith
Holland & Knight LLP
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
Phone: (703) 720-8571 (McAdams)
Phone: (703) 720-8579 (Slaughter)
Phone: (703) 720-8584 (Smith)
Facsimile: (703) 720-8610
E-mail: john.mcadams@hklaw.com (McAdams)
E-mail: tanner.slaughter@hklaw.com (Slaughter)
E-mail: ben.smith@hklaw.com (Smith)